MAX N. TOBIAS, JR., Judge.
liOn 20 September 2007, Herbert Everett (“Everett”) and Tyrone “Pookie” Crump (“Crump”) were indicted for the 30 June 2007 first degree murder of Arthur Jackson (“victim”), a violation of La. R.S. 14:30. They entered not guilty pleas at their arraignments on 3 and 5 October 2007.
Among others, defense counsel filed motions to suppress, which the trial court denied on 6 November 2008.
Everett filed a motion to sever his trial from that of his co-defendant, Crump, which was denied.
On 31 March 2009, the state amended the charge to second degree murder.
One week prior to trial, the defense filed a motion to prohibit Karl Stokes (“Stokes”) from making an in-court identification of the defendants on the grounds that he had not previously identified them in a pretrial identification procedure. The trial court granted the motion. The state sought supervisory review of the ruling, but its writ application was denied. See State v. Crump, 09-1216, unpub. (La.App. 4 Cir. 9/11/09), writ den., 09-1980 (La.9/11/09), 17 So.3d 380.
The case proceeded to trial on 14 September 2009. On the first day of trial, the defendants filed a verbal motion in limine to prohibit the introduction (as 12inadmissible hearsay) of the statement made by Kareem Davis (“Davis”) to Nek-eia Jackson Sanders (“Nekeia”); the statement was made shortly before the shooting in which Davis identified the defendants. The trial court granted the motion and prohibited the state from introducing the statement into evidence. Prior to and during Nekeia’s testimony, the defense renewed its hearsay objection to Davis’ statement identifying the defendants. The *613 trial judge repeated her prior ruling disallowing the verbal statement, but she allowed the state to introduce the lineup of each defendant, which included Nekeia’s signature and her notation of the date and the defendant’s name on the back of the lineup photo.
At the conclusion of the trial, the jury-returned a verdict of guilty as charged as to both defendants. The defendants filed motions for new trial, which were denied. On 5 October 2010, the defendants were sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence.

STATEMENT OF FACTS

At approximately 4:30 p.m. on 30 June 2007, New Orleans Police Department (“NOPD”) Detective Orlando Matthews received a call from dispatch concerning gunshots fired at North Galvez and Conti Streets. He arrived and secured the scene and in doing so, he observed several spent bullet casings and glass in the middle of the street. He also noted that in the chaos several people were milling around the area yelling names and other information. Detective Matthews identified the state’s exhibits 3B through 3K as photographs of the crime scene — street signs, spent bullet casings, broken glass and his police M-Cop Isvehicle.[1] Detective Matthews remained on the scene until NOPD Crime Scene Specialist, Derrick Melder, collected the spent bullet casings. The detective did not interview any witnesses, but he learned that the victim had been transported to the hospital by a friend.
Detective Matthews identified police reports describing the perpetrators as two young black males; the report describes the clothing — blue jeans and black shirt— of only one of the suspects. Further, the report indicated that “subject fled on foot down Conti, river bound ...” in the direction of the Iberville Housing Project. Detective Matthews did not obtain any names or nicknames of the suspects.
NOPD Officer Steven Lindsey also responded to a signal 94 call (shots fired) at the intersection of Conti and North Galvez Streets. Detective Matthews radioed Officer Lindsey with a report of spent bullet casings and broken glass at the scene. After speaking with Detective Matthews, Officer Lindsey received a call from dispatch, advising him that the victim was en route to University Hospital.
Officer Lindsey started a Major Offense Report Form (“MORF”) as Sergeants B. Mitchell and R. Dassel arrived. Sergeant Mitchell requested that Officer Lindsey relocate to University Hospital to determine the victim’s status. As Officer Lindsey pulled up to the hospital, he observed a light blue 2007 Chrysler Pacifica van parked in the parking lot with a black male standing next to it. The black male identified himself as Karl Allen (“Allen”), brother of the victim, and |4the person who transported the victim to the hospital. Officer Lindsey observed multiple bullet holes in the passenger’s side of the van, windows shot out, and the front passenger seat covered with blood. The state and defense stipulated to the authenticity of the state’s photographs of the van — Exhibits 3-L through 3-S.
Dr. Mills, the emergency room physician and head trauma surgeon, reported to Officer Lindsey that the victim was in very serious condition as a result of seven gunshot wounds. Officer Lindsey relayed the information to his ranking officer. He secured the van and waited for NOPD Crime Lab personnel to process the vehicle. As Officer Lindsey waited, Detective Lester *614 Marshall and Sergeant Bradley Rhodes arrived. Lindsey directed them to Allen.
Under cross examination, Officer Lindsey agreed that a good deal of the blood in the van was mostly in the rear passenger side of the vehicle, but that there were significant blood stains in the front passenger seat as well. He identified the MORF bearing item number F-36397-07 as the form authored by Detective Marshall.
Detective Marshall, the case investigator, reported to University Hospital, accompanied by Detective Charles Augustus. Detective Marshall inspected the van and spoke with Allen. He also spoke with the victim, who told him, “I don’t know what happened. I didn’t see it coming.” Detective Marshall also talked to Allen’s ten-year old son, Stokes; Allen and his son were both in the vehicle at the time of the shooting. He also spoke with Davis, who was at the scene at the time of the shooting. Detective Marshall relocated to the scene and spoke with the Riley Sanders (“Sanders”), owner of R & N Auto Sales, the business where the shooting occurred.
1 ¾While under cross-examination, Detective Marshall identified the MORF of this incident. He learned from Allen that Sanders was the owner of the business and on the scene when the shooting began. Sanders, however, denied knowing anything about the incident.
Specialist Melder, tasked with photographing, collecting, and preserving evidence at. the scene, retrieved ten bullet casings — seven .40 caliber and three .357 caliber — and he placed them into Central Evidence and Property.
NOPD Crime Scene Technician Aven Cooper’s (“Cooper”) job entails photographing and searching for evidence at crime scenes. On 20 July 2007, she processed the blue Pacifica van involved in this shooting pursuant to the request of Detective DeCynda Barnes. Cooper identified state’s Exhibit 8 as the report of her findings regarding the van — photographs of the van’s driver’s side door displaying bullet holes and broken glass, the exterior of the rear passenger door, and a spent bullet confiscated from the driver’s side, all of which she submitted to Central Evidence and Property.
Orleans Parish Coroner’s forensic pathologist, Dr. Samantha Huber, autopsied the victim’s body in July 2007. Her autopsy protocol, state’s Exhibit 13, reflects that the victim was shot seven times. The fatal shot entered the victim’s back, went into his abdominal cavity, hit the left kidney, the spleen, the pancreas, the liver, and the heart and lodged in the victim’s left lung, causing massive bleeding.[2]
NOPD Officer and firearms examiner, Kenneth Leary, Jr., has the task of determining whether a bullet casing retrieved from a crime scene was fired from one particular weapon to the exclusion of all others. Officer Leary accomplishes |fithis through microscopic examination of firing pin impressions, breech face markings, and striation marks present on fired bullets which are compared to each other and determines whether they were fired from the same weapon. Officer Leary tested the bullet casings retrieved from the scene and determined that casings were fired by two different weapons — a .40 caliber pistol and a .357 caliber semi-automatic pistol.
Detective Barnes took over the investigation of this case on 11 July 2007. She contacted the victim’s next of kin and visited the crime scene. Until she studied the initial report and the MORF, she had no suspects. She spoke to approximately six to eight individuals associated with the case, including Ms. Patricia Moore (the *615 victim’s mother), Davis, who made a tentative identification of Crump, but was unable to identify Everett, Allen,[3] Stokes, and Sanders.
Detective Barnes’ investigation led her to the discovery of two eyewitnesses — husband and wife, Sanders and Nekeia,[4] where the shooting occurred. When presented with two six-person photo lineups prepared by Detective Barnes, Nekeia identified Crump as the person she saw shoot the victim. From the second photographic lineup, Sanders identified Everett as the other shooter. Sanders identified Grump from the photographic lineup he viewed, but he could not identify Everett. Based upon this information, Detective Barnes obtained arrest warrants for Crump and Everett as well as search warrants for their residences. He also obtained a taped statement from Nekeia in which she explained her knowledge of the shooting.
17Execution of the search warrant for Crump’s residence produced a black t-shirt, paper work containing Crump’s name, and a photograph of Crump holding a black automatic handgun. The search of Everett’s residence yielded .357 Sig bullets, .45 caliber bullets and one .32 caliber bullet. The murder weapon was never recovered.
Stokes was in the van with his uncle, the victim, who was driving, and his father on their way to the car repair shop on North Galvez and Conti Streets. As they pulled up to the car shop, a man came to the passenger side of the car to speak with his father. Shortly thereafter, two black males approached the left door of their car. Stokes heard his father say, “There go Pookie and Herb” as the men began firing into the van. The victim was shot about eight times. Allen pulled the victim from the driver’s seat into the rear of the van and drove the victim to the hospital. Stokes gave a statement to two police officers at the hospital.
Orleans Criminal Sheriff Deputy Alvin McClean, Sr. was standing across the street from R and N Auto Sales when he heard gunshots. He called 911 and spoke with officers who arrived at the scene. He drove through the neighborhood with the officers searching for a vehicle seen fleeing the area.
Nekeia had a conviction for simple assault. On 30 June 2007, she co-owned a used car lot at Conti and Galvez Streets. On that day, her car, a yellow truck, and a blue Pacifica van were parked at her business. Sanders, Davis, Allen, and the victim were at the location hanging out. She was standing in front of her shop speaking with Davis when a blue Chrysler Pacifica van pulled up. She did not know the occupants of the van. Sanders approached the right side of the van to speak with Allen. Three or four minutes later, she observed two men coming from the neutral ground (median) toward the van. Davis told her that the men were |8“Pookie and Herb.” As one of the men stepped off the neutral ground, he pulled a handgun from under his shirt, walked to the van, and started shooting into the driver’s side at the victim. When the shooting started, she was standing approximately fifteen feet from the shooter, allowing her to see his face. Nekeia identified Crump in court as the man she saw shoot the victim. Next, she noticed the second armed man, which prompted her to take cover under her car. She could not tell whether the second man shot at the van, but she observed Crump walk back to where he came *616 from. She could not say which direction the second man walked.
When the shooting stopped, the van sped away toward Galvez Street and the Iberville Housing Project. In her statement to Detective Barnes, Nekeia said she assumed that Allen drove the van from the passenger seat with the use of his prosthetic leg. As the van pulled away, she left in her car to go home, but she returned to the scene about two or three minutes later. The first police arrived about five minutes later, and she gave a statement to an officer. Two or three weeks after the incident, Nekeia met with Detective Barnes, repeating what she saw. She advised Detective Barnes that she could identify the shooters. From the first photo lineup, Nekeia identified Crump. From the second lineup, she identified Everett. On direct examination, Nekeia admitted that Sanders was presently in jail for dealing drugs, having served two years of a twenty-year sentence. She denied speaking to anyone in the federal government about her husband’s sentence. Finally, she made an in court identification of Everett as the other gunman.
Nekeia identified pictures of the auto business and the surrounding area. She also pointed out where the Pacifica van was parked at the time of the shooting. She said that Sanders ran the business, which involved performing body work, mechanical repairs, et cetera. When she met with Detective Barnes after the ^shooting she did not name either suspect because she was not asked their names. In pretrial hearings she claimed she did not know either of the suspects, but testified at trial that she knew them at the time of the shooting. In addition, Nekeia verified that her husband pled guilty to distribution of cocaine, and that he went into federal custody on 6 July 2007. However, she denied that her husband was a government informant testifying in this case in hopes of reducing his twenty-year sentence. She verified that at the time of the shooting, her husband was out on bond from both a federal and state charge. She emphatically stated that she was testifying because of the pain the victim’s mother had endured.
Nekeia did not know the defendants’ names at the time of the shooting, only their nicknames — “Pookie” and “Herb.” Her friend told her their real names. She also said that she did not want to be seen talking to the police because she did not want people to consider her a “rat” or a “snitch.” She denied being offered anything in return for her testimony. Also, she said that her testimony was truthful.
Sanders was arrested on federal distribution of crack cocaine charges on 1 December 2006. He remained in jail until he bonded out three weeks later. His bond was revoked as a result of his arrest on a state distribution of marijuana charge in June of 2007.[5] His arrest on the state charge and his bond revocation both occurred before this shooting on the 30 June 2007. Sanders pled guilty to the federal charge in June 2007 and was sentenced to twenty years. As a part of his plea agreement, Sanders was required to cooperate with federal agents, including working as an informant and reporting any criminal activity he saw. At the time of the shooting, Sanders was scheduled to turn himself in to federal authorities on 6110July 2007.[6] He said that neither he nor his wife was promised or given anything by the state or the federal government for his testimony in this case. At the time of trial, he has *617 already served two years of his twenty-year sentence.
At about 4:30 p.m. on the day of the shooting, Sanders, Nekeia, Daws, Beatrice Peters, Andre Peters, “Clarence” and “Derek” were hanging out at the auto business that Sanders and Nekeia owned at North Galvez and Conti Streets. The victim, Allen and Stokes arrived at the shop in a blue Chrysler Pacifica van. The victim was driving. Allen sat in the front passenger seat while his son sat in the back seat. While Sanders was leaning into the front passenger window of the van speaking to the victim and Allen, he noticed two men walking across the street from the direction of North Claiborne Avenue. Sanders told the victim to pull off, but it was too late. One of the two men crossed the street and pulled a gun from his under shirt. The man walked to the driver’s side and began shooting into the van. Sanders ran to the back of the shop. As he came out, he saw Allen leaning over into the driver’s seat driving the van as it sped away from the area. Everybody at the shop scattered but returned shortly thereafter to speak with the police. Sanders identified Crump as the man who shot into the van.
Sanders knew that there were two assailants. He saw them and heard two different gunshot sounds. He told the police he did not see anything because according to his plea deal, he was to contact federal agents. He attempted to reach the NOPD after the shooting but was unsuccessful. A few days later, he turned himself into federal authorities.
In July, federal agents transferred Sanders from the St. Charles Parish jail to the federal building in the central business district of New Orleans. He told the | n agents what he knew about the shooting. A few days later Detective Barnes spoke to him about the investigation and showed him two photographic lineups. Sanders identified Crump from one of the lineups but could not identify anyone else. He did not speak to his wife about the identification. He said he testified at trial because the victim was his friend.
Detective Marshall was also called as a witness by the defense. He related that on the afternoon of the shooting, he and Detective Charles Augustus went to University Hospital to speak with the victim and any witness who might be at the hospital. Detective Marshall had completed the MORF, which he identified at trial, setting forth the information he gleaned from his investigation. He testified that he spoke to Allen and Stokes on the day of the incident, and that their statements corroborated one another. Stokes told the detective that the victim was at Conti and North Galvez Streets when he was shot. He also told Detective Marshall that when the shooting started, his father threw him to the ground. Stokes also said that he was a passenger in the vehicle when his father drove the victim to the hospital. Stokes described the shooter as a dark-skinned, black male wearing a dark shirt, armed with a blue steel handgun, who shot at the victim from across the street. When the shooting ended, Stokes heard a vehicle speed away. After his conversations with Allen and Stokes, Detective Marshall spoke to Sanders, who said that when the shooting started, he dropped to the ground. Sanders denied seeing the shooters.
On cross-examination by the state, Detective Marshall said the MORF is not meant to be a thorough investigation of the incident. He acknowledged that he did not take down everything witnesses told him, but that he tried to be as accurate as possible. When he testified that Allen’s and Stokes’ statements corroborated each LoOther, he meant as far as general facts— *618 that Stokes was with Allen at the time of the shooting, and that Allen threw Stokes down when the shooting began. Neither Stokes, Allen, nor Sanders gave the detective the name of either perpetrator. Detective Marshall observed bullet holes and a large amount of blood in the rear seat of the van.
Next, Detective Matthews testified that he was the first officer at the scene, and that he did not interview any witnesses. He was concerned with preservation of the scene and collection of evidence. He did not remember speaking with Nekeia at the scene.
The defense called Detective Barnes to testify. She stated that from the information on the incident, there was no indication Nekeia spoke to anyone with the NOPD prior to the statement she gave to her on 25 July 2007. When Detective Barnes met with Nekeia at the police station on City Park Avenue, she recounted the incident, and she also gave Detective Barnes the names of the perpetrators.
Nekeia was called as a witness by the defense. She verified that in her taped statement she said that she saw Crump at a store on Franklin Avenue the day after the shooting. After the shooting, she called her sister, Craigshonda Lunkins (“Lunkins”). She also said that she did not see the second man shoot into the van because she got under her car.
Under cross-examination by the state, Nekeia explained that Lunkin’s boyfriend and the defendants were best friends.
The defense called Lunkins. Nekeia had called her about the shooting, but Nekeia did not identify the shooters. Lun-kins said she testified because Nekeia was not honest in her testimony. Lunkins denied that her boyfriend and the defendants were friends.

[^ERRORS PATENT

A review for errors patent on the face of the record reveals none exist.

COUNSEL ASSIGNMENT OF ERROR NUMBER 1

In the first counsel assignment of error, the defendants argue that the evidence was insufficient to convict them of second degree murder. They contend that the witnesses’ identification of the defendants was unreliable because it was based upon “biased and perjured” testimony and inadmissible hearsay.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A factfin-der’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, 00-1082, p. 33 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.
Constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt. State v. Mussall, 523 So.2d 1305, 1309 (La.1988).
Although the defendants in this case do not argue that the state failed to establish any of the statutory elements of their convictions, the issue is considered pursuant to the directive of Jackson, supra.
In order to prove second degree murder, the state must show the killing of a human being, and that defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1.
*619 114Specific intent “exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the defendant’s actions. State v. Smith, 94-2588, p. 5 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, 1037, citing State v. Graham, 420 So.2d 1126 (La.1982) and State v. Marshall, 657 So.2d 1106, 1106 (La.App. 4 Cir.1995).
Nekeia testified that at the time of the shooting, she was standing in front of her auto repair business when the victim arrived driving a blue van. Her husband, Sanders, went to the vehicle and began conversing with the victim and his passenger, Allen. The next moment, Nekeia observed “Pookie and Herb” approach the van, pull weapons from under their shirts, and begin shooting. Nekeia watched as the defendants deliberately fired numerous shots at point blank range into the van, hitting the victim and causing catastrophic injuries. She identified both defendants from photo lineups, while Sanders identified Crump. Her testimony concerning the attack was corroborated by Sanders, Davis and Stokes. The autopsy of the victim’s body performed by Dr. Samantha Huber revealed that the victim had been shot seven times. The fatal shot entered the victim’s back, entered his abdominal cavity, and perforated almost all of his vital organs. The victim died from massive internal bleeding. The facts of the shooting prove that the defendants had the specific intent to kill the victim. See State v. Broaden, 99-2124, p. 18 (La.2/21/01), 780 So.2d 349, 362 (pointing and firing a gun at point-blank range supports an inference of specific intent to kill).
Thus, the state proved all the elements of second degree murder.
|1sIn addition to proving the statutory elements of the charged offense at trial, the state is required to prove the defendant’s identity as the perpetrator. State v. Ingram, 04-551, p. 6 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926.
When identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), to-wit: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. See State v. Brealy, 00-2758, p. 8 (La.App. 4 Cir. 11/7/01), 800 So.2d 1116, 1121.
A positive identification by only one witness is sufficient to support a conviction. State v. Leger, 05-0011, p. 92 (La.7/10/06), 936 So.2d 108, 170, citing State v. Mussall, 523 So.2d 1305, 1311 (La.1988).
In this case, Crump was identified by Allen, Stokes, Nekeia, Sanders, and Davis. Four witnesses identified Everett — Allen, Stokes, Nekeia, and Davis. The witnesses’ testimony meets the Manson criteria.
Though Allen did not testify at trial, his son, Stokes, testified as to his father’s identification of the defendants. Stokes said that just moments before the shooting began, his father said, “There goes Pookie and Herb.”[7]
*620 Nekeia testified that she got a good look at Cramp and Everett as they crossed the street and fired into the van. She identi-fiedthe defendants from two ^separate photographic line-ups and at trial. Moreover, she repeated Davis’ on-the-scene identification of the shooters as “Pookie” and “Herb.”
Sanders said he watched the two suspects approach the van and begin shooting. He recognized Crump as one of the shooters, but he was unable to identify Everett. Sanders pointed out Crump at trial, as well as having identified him from two photo lineups.
Davis identified Cramp from a photograph lineup, but he could not identify Everett.
During trial, the defendants sought to block the state’s introduction of the hearsay statement Davis made to Nekeia just before the shooting began. Davis told Nekeia that the shooters were named “Pookie” and “Herb.” The defendants argue that even if the statement is admissible, Davis’ retraction of his identification renders it unreliable. In addition, the defendants argue that no physical evidence exists linking them to the crime.
Nekeia testified she got a good look at the shooters but that she did not know their names until Davis told her who they were. Nekeia wrote the name of each defendant on the back of the respective defendant’s lineup photograph.[8]
At trial the defendants argued that Davis’ out of court identification was hearsay. The trial judge agreed, and she denied the state’s request to introduce Davis’ identification.
Davis’ identification of the defendants is hearsay; however, it is exempt from the hearsay rale as an “excited utter-anee” under La. C.E. art. 803. La. C.E. art. 803(2) states that “[a] statement relating to a startling event or condition made Awhile the declarant was under the stress of excitement caused by the event or condition” is not excluded by the hearsay rule. This is the so-called “excited utterance” exception. This exception requires an occurrence or event sufficiently startling to render the declarant’s normal reflective thought process inoperative, so that the statement is a spontaneous reaction to the occurrence or event. State v. Dalton, 99-0902, pp. 3-4 (La.App. 4 Cir. 3/29/00), 759 So.2d 180, 182-183. To determine whether the declarant was under stress of an excited event, the time span between the event and the statement is considered as the most important factor; the trial court must determine whether the interval between the event and the statement was of sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process. State v. Lee, 01-2082, p. 12 (La.App. 4 Cir. 8/21/02), 826 So.2d 616, 626. Factors that may indicate that a statement was the result of reflective thought are evidence that the statement was self-serving or made in response to an inquiry; expansion of the excited utterance beyond a description of the event and into past or future facts; and proof that, between the event and the statement, the declarant performed tasks requiring reflective thought process. State v. White, 00-1740, p. 5 (La.App. 4 Cir. 11/21/01), 802 So.2d 869, 873.
In Lee, supra, the defendant was found guilty of aggravated battery. On appeal, the defendant argued that the trial court *621 erroneously admitted the testimony of Officer Carter. At trial, the officer had testified that when he arrived at the crime scene, he observed the victim[9] crying and in pain. The victim immediately told Officer Carter that the defendant struck her with a hammer. This court determined that because the officer arrived at the scene within minutes of the 118incident, and observed the victim’s fear, agitation, and pain, the testimony clearly fit within the excited utterance exception to the hearsay rule and was properly admitted into evidence.
Likewise, in State v. Rios, 44,132 (La.App. 2 Cir. 4/8/09), 7 So.3d 832, the court considered the excited utterance exclusion to the hearsay rule. In Rios, the car sales manager at a car dealership testified that the defendant entered the dealership, and that the men had a brief conversation. The defendant left, and the manager never saw the defendant again; however, a few minutes later, an employee[10] of the dealership, came into the showroom “lookfing] excited and stirred up.” When the manager asked the employee what happened, he replied, “... that ... dude that was just in the showroom jumped in a truck and took off.” The manager testified that he assumed that defendant was the “dude.” The defense objected; however, the state argued that the statement was being introduced not to prove the truth of what was said, but to explain the manager’s actions after he received the news from the employee. The court decided that the employee’s statement was a spontaneous declaration related to a startling event and would qualify as an excited utterance and thus admissible although hearsay.
In this case, as in Lee and Rios, the declarant did not testify at trial. Davis’ statement to Nekeia was “relat[ed] to a startling event ... made while [he] was under the stress of excitement caused by the event....” La. C.E. art. 803(2). Moreover, Davis made the statement immediately upon observing the armed defendants approach the van. Further, the statement was made without “a reflective thought process.” Lee, 01-2082 at p. 12, 826 So.2d at 626. Davis’ 119statement was in no way self-serving or made in response to an inquiry. The excited utterance did not exceed a description of the event, and between the event and the statement, the declarant did not perform tasks requiring reflective thought process. Id.; see also White, supra.
Nevertheless, even if the complained of testimony was improperly allowed as an exception to the hearsay rule, the Supreme Court has long held that the admission of hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. State v. Johnson, 389 So.2d 1302, 1306 (La.1980).
A review of the record indicates that the verdict in this case was not attributable to the asserted error that the trial court allowed inadmissible evidence and was, therefore, harmless. Even excluding Davis’ out of court identification, Crump was identified by four other witnesses— Allen, Stokes, Nekeia, and Sanders. Everett was identified by three witnesses— Allen, Stokes, and Nekeia. The “effect of [Davis’ out-of-court identification] was merely cumulative or corroborative of other testimony adduced at trial.” Id.
Alternatively, the defendants claim that even if Davis’ identification may properly be used as substantive evidence of guilt, because there is no physical evidence link *622 ing the defendants to the murder, the verdict is improper. ■
The defendants’ are mistaken. This court has observed that “[w]hile there [is] no physical evidence to link defendant to the crime, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion.” State v. Marshall, 99-2176, p. 12 (La.App. 4 Cir. 8/30/00), 774 So.2d 244, 252. Credibility assessments are fundamentally the jury’s province. State v. Trosclair, 443 So.2d 1098, 1106 (La.1983). The jury has great discretion 12oin deciding whether to believe or reject a witness’s testimony. See State v. Mussall, 523 So.2d 1305 (La.1988). Based upon evidence presented to the jury in this case, we do not find the jury abused its discretion by accepting the state’s witnesses’ testimony.
Next, the defendants argue that a retracted identification is insufficient as a matter of law to support a conviction.
Jurisprudence does not support the defendants’ argument.
In State v. Collins, 01-1459 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, a witness at trial denied she told officers that the defendant was the gunman. The officers and another witness testified, however, that the witness had informed them that the defendant was the gunman. We found that the witness’ prior statements were not hearsay because they fell within the exception provided by La. C.E. art. 801 D(l)(c) (prior identification). We upheld the conviction based on the out of court identification the witness denied making. See also State v. Gordon, 10-1286, unpub. (La.App. 4 Cir. 8/19/11), 68 So.3d 1238 (Table).
In State ex rel. D.W., 09-855 (La.App. 5 Cir. 9/14/10), 47 So.3d 1048, several witnesses recanted their statements at trial. The court held that the prior inconsistent statements were admissible for their assertive value and could be considered substantive evidence of guilt in an adjudication for attempted murder arising out of the shooting of two victims, where the witnesses’ prior inconsistent statements were statements of identification, saying they recognized the juvenile as the shooter, and there was additional evidence, including police officer testimony at trial and photographic lineup identification, to corroborate the matter asserted.
In State v. Harper, 27,278 (La.App. 2 Cir. 8/23/95), 660 So.2d 537, |2the court addressed whether testimony at trial from two police officers concerning a witness’ prior identification of the defendant was admissible where, at trial, the witness testified she could not identify the defendant. The court held that pursuant to La. C.E. art. 801 D(l)(c), the testimony concerning the prior identification was non-hearsay, and any discrepancy between that identification and the in-court identification testimony was a matter for the jury to weigh. Id., p. 13, 660 So.2d at 545. The defendant’s conviction based on the victim’s out of court identification was upheld on appeal.
In State v. Wright, 98-0601 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, a witness to a shooting testified at trial that the physical appearance of the defendant led him to believe the defendant was the shooter, but the witness could not be positive because he did not see the shooter’s face. However, a prior identification made of the defendant by the witness in his testimony before a grand jury was admissible when the witness testified at trial that he could not identify the defendant. The court upheld the conviction, noting that the jury apparently believed that the eyewitness had “back[ed] off a little bit” from his identification of the defendant as the shooter *623 since testifying before the grand jury because of fear of reprisal.
Based on the foregoing cases, Davis’ out of court identification was admissible. However, even if the statement was inadmissible, the information therein came into evidence through Nekeia’s identification of the defendants via the photo lineups, which contained her signature on the respective defendant’s picture. In addition, the defense broached the issue of Davis’ identification during |22its questioning of Detective Barnes.[11] If there was error, it was harmless considering the other identifications of the defendants.
At trial, Nekeia identified both defendants as the men who shot the victim. Sanders identified only Crump. The defendants argue these in-court identifications are unreliable, biased, untrustworthy, and should not be accorded any weight.
The defendants emphasize that Sanders initially denied being a witness to the shooting when he was interviewed by police at the scene. Also, they note that Sanders came forward with his identification only after he was arrested on a state marijuana charge and had forfeited his federal bond. Continuing, the defendants argue that Sanders and Nekeia lied when they identified the defendants, and that they did so solely for the purpose of obtaining a reduction of Sanders’ twenty-year federal sentence.
Sanders candidly admitted he lied to the police when he said he did not witness the shooting. He also admitted that in exchange for his cooperation with the state, he hoped to receive favorable consideration of his request for sentence reduction.
As to Nekeia, the defendants note that although she testified that she identified the defendants to the police on the day of the shooting, no evidence was presented at trial to prove her assertion. Further, they argue that none of the police reports reflects that she was interviewed on the day of the shooting and none of the testifying officers recalled speaking with her on that day.
Not all of the officers present at the scene were called to testify at trial. While the officers who did testify said they had no recollection of speaking with I^Nekeia, such does not render her identification unreliable because she may have spoken to non-investigating police personnel present at the scene.
It is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court’s function is to determine the constitutional sufficiency of the evidence presented. State v. Barthelemy, 09-0391, p. 25 (La.App. 4 Cir. 2/24/10), 32 So.3d 999, 1015,[12] writ den., 10-0706 (La.10/29/10), 48 So.3d 1097.
The defense’s claim of bias and perjury with respect to Nekeia’s and Sanders’ identifications of the defendants as the shooters was considered by the jury. After. examining all of the evidence and weighing the credibility of the witnesses, the jury chose to credit their testimony. We do not assess credibility or re-weigh the evidence. Id. at p. 25, 32 So.3d at 1015.
This assignment has no merit.

*624
COUNSEL ASSIGNMENT OF ERROR NUMBER 2 AND EVERETT PRO SE ASSIGNMENTS OF ERROR NUMBERS 1 AND 2

In these assignments, the defendants argue their right to present a defense of misidentifieation was frustrated by the exclusion of Allen’s statement to Detective Matthews at University Hospital.
The defendants deny that the statement is hearsay because it falls within the present sense impression and excited utterance exceptions of La. C.E. art. 803(1) and (2). Next, they argue that Allen’s statement cast doubt on Sanders’ and Nekeia’s identifications of the defendants as the shooters. Further, they maintain that the statement proves that Allen knew the defendants and described the | ^shooters as “unknown dark skinned males,” when, in fact, “[n]either defendant is dark skinned.”
The statement at issue is contained in the MORF prepared by Detective Marshall:
The Detectives spoke with Karl Allen who stated his friend, Arthur Jackson, was shot at Conti and N. Galvez Street, and he drove him to the hospital. Allen said his son, Karl Stokes (10 years old) and -victim Arthur Jackson were passengers in his vehicle. Allen drove to R.N. Auto Shop to meet with the owner, only know as “Riley”, to inquire about having his car repaired. Allen stated he parked in front of the business and they exited the vehicle. They stopped in the street, next to his car to talk with ‘Kareem’, ‘Riley' and several other unknown black males. Allen said about four to five minutes later he heard six or seven gunshots, Allen threw his son to the ground and heard Jackson yell he was shot. Allen looked up and observed a dark colored unknown type vehicle speed off westbound on N. Galvez Street. Allen did not see the shooter or the driver....
Karl Stokes statements corroborated with the above. Stokes added he saw an unknown dark skin black male, wearing a dark shirt shooting from across the street....
La. C.E. art. 808 provides in pertinent part:
(1) Present sense impression. A statement describing or explaining an event or condition made while the de-clarant was perceiving the event or condition, or immediately thereafter.
(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. [Emphasis in original.]
In State v. Jones, 98-1055, p. 6 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 98, citing Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76 (La.1990), the court noted that the Louisiana Supreme Court previously explained a present sense | ^impression exception to the general rule against admitting hearsay, finding, “[t]he statement may follow ‘immediately’ after perceiving an event, allowing only for ‘the time needed for translating observation into speech.’ ”
In State v. Ditcharo, 98-1374, pp. 9-10 (La.App. 5 Cir. 7/27/99), 739 So.2d 957, 963, the court found that an officer’s testimony was admissible as a present sense impression exception where the victim testified that she gave a statement to the police five minutes after she was stabbed.
In State v. Dillard, 45,633 (La.App. 2 Cir. 11/3/10), 55 So.3d 56, an eyewitness died prior to trial. The defense objected to introduction of the statement arguing that it was hearsay. The trial judge disagreed finding that present sense impression allowed introduction of the statement. The Second Circuit agreed with and quot *625 ed the trial judge’s reasoning for her decision:
... The Court, with regard to any information the deceased witness gave the police ... as the chase was ensuing ... allowed the testimony concerning that information because it was present sense impression and perhaps an excited utterance; however, the information that [sic] deceased witness gave to police officers a day or two after the incident took place was prohibited from being admitted at trial since it did not come within the present sense impression or the excited utterance exception.
Id., p. 10, 55 So.3d at 62.
In State v. Price, 05-2514 (La.App. 1 Cir. 12/28/06), 952 So.2d 112, the court decided that the testimony of the victim’s friend that she and the victim spoke by cell phone moments before and at time of the vehicular accident was a res gestate exception to the hearsay rule under present sense impression and excited utterance. The court noted that the victim’s statements to her friend described the defendant’s reckless driving as it was happening, and the friend’s | ^testimony appeared to indicate that the accident occurred just as the victim was trying to get defendant to pull over.
As to the application of the present sense impression exception to the case at bar, Allen made the statement at University Hospital, approximately fifteen minutes after the shooting, not within “the time needed for translating observation into speech.” The statement was not made while Allen was perceiving the shooting or immediately thereafter. Consequently, the present sense impression exception does not apply to Allen’s statement.
Considering the excited utterance exception to the hearsay rule, we note no evidence in the record that Allen’s statement was made while he was under the stress of excitement caused by the shooting. Therefore, the statement is not admissible under the excited utterance exception to the hearsay rule.
Next, the defendants maintain that even if Allen’s statement is hearsay, it is nonetheless admissible pursuant to Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). The exclusion of Allen’s statement, defendants argue, negatively impacted their confrontation rights.
Traditionally, for purposes of the Confrontation Clause, all hearsay statements were admissible if (1) the declarant was unavailable to testify, and (2) the statement fell under a “firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.” Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court overruled Roberts insofar as it applies to out-of-court statements that are “testimonial” in nature. The Crawford Court held that the adequate “indicia of reliability” standard set forth in Roberts is too amorphous to adequately prevent the 127admission of “core testimonial statements that the Confrontation Clause plainly meant to exclude.” Crawford, 541 U.S. at 63, 124 S.Ct. 1354.
The Crawford Court drew a distinction between testimonial and non-testimonial hearsay and noted that non-testimonial hearsay is admissible where both prongs of Ohio v. Roberts are satisfied, regardless of whether the defendant has had a prior opportunity to cross-examine the declar-ant. The Court held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the *626 defendant has had a prior opportunity to cross-examine the declarant.
Crawford’s per se bar applies regardless of whether the testimonial statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness. Although Crawford left open the question of whether the admissibility of nontestimonial statements were still to be evaluated under the pre-Crawford analysis, the Supreme Court has since made clear that the right to confrontation has no application to nontestimonial statements. Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
In Davis, 547 U.S. at 822, 126 S.Ct. 2266, the Court declared that “[statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Conversely, statements are “testimonial when the circumstances objectively indicate there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.” Id.
bain Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), police found the victim in a gas station parking lot mortally wounded. The victim told the police that he had been shot by the defendant at the defendant’s house and had then driven himself to the gas station parking lot. At trial the officers testified about what the victim told them. The defendant was convicted of second degree murder. The Michigan Supreme Court reversed his conviction, holding that the Sixth Amendment’s Confrontation Clause, as explained in Crawford and Davis, rendered the victim’s statement inadmissible testimonial hearsay. The United States Supreme Court reversed, holding that the victim’s identification and description of the shooter and the location of the shooting were not testimonial statements because they had a “primary purpose ... to enable police assistance to meet an ongoing emergency.” Davis, 547 U.S. at 822, 126 S.Ct. 2266. Therefore, their admission at the defendant’s trial did not violate the Confrontation Clause. Davis, 547 U.S. at 824-825, 126 S.Ct. 2266.
An out-of-court statement is non-testimonial and not subject to the Confrontation Clause if it “... was made ... under circumstances objectively indicating that the primary purpose ... [was] to enable police assistance to meet an ongoing emergency.” Davis, 547 U.S. at 822, 126 S.Ct. 2266.
To make the “primary purpose” determination, a court must objectively evaluate the circumstances in which the encounter between the individual and the police occurs and the parties’ statements and actions, ie., at or near a crime scene or at a police station, during an ongoing emergency or afterwards. Id. The existence of an “ongoing emergency” at the time of the encounter is among the most important circumstances informing the interrogation’s “primary purpose.” Id., 547 U.S. at 828-830, 126 S.Ct. 2266. An emergency focuses the participants not on “proving]) Mpast events potentially relevant to later criminal prosecution,” id., 547 U.S. at 822, 126 S.Ct. 2266, but on “endfing] a threatening situation.” Id., 547 U.S. at 832, 126 S.Ct. 2266. “An assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to the first responders and public may continue.” Bryant, — U.S. at -, 131 S.Ct. at 1148.
*627 Allen gave his statement to Detective Matthews at the hospital moments after the shooting, during the emergency of obtaining medical attention for the victim (his brother) and while the police were actively engaged in searching for the shooters, who were still at large and posed a danger to the public. See Bryant, — U.S. at -, 131 S.Ct. at 1148. The statement was nontestimonial to which the right to confrontation has no application. See Davis, supra. However, even if there was error in excluding the statement, confrontation claims are subject to a harmless error analysis. State v. Moore, 10-0314, p. 7 (La.App. 4 Cir. 10/13/10), 57 So.3d 1033, 1038-39. In this case, the evidence establishing the defendants’ guilt was substantial, even overwhelming. They were identified in photographic line ups prior to trial and by no less than five eyewitnesses at trial.
Next, the defendants argue that even if the statement is hearsay, it should have been admitted into evidence because it exonerated them, and further, it contradicted the testimony of Nekeia and Sanders, thereby eliminating the reliability of the Sanders’ identification.
As a general matter, the Louisiana Supreme Court has recognized that under compelling circumstances a defendant’s right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule. State v. Juniors, 03-2425, pp. 44-45 (La.6/29/05), 915 So.2d 291, 325-26, citing State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198; State v. Gremillion, 542 So.2d 1074 (La.1989). See also Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Normally inadmissible hearsay may be admitted if it is reliable, trustworthy, and relevant, and if to exclude it would compromise the defendant’s right to present a defense. Van Winkle, 94-0947 at p. 6, 658 So.2d at 202. This right to present a defense, however, does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Fernandez, 09-1727, p. 14 (La.App. 4 Cir. 10/6/10), 50 So.3d 219, 229.
In this case, the defense contends that reading Allen’s statement in conjunction with his son’s statement to the police proves that the defendants were not the perpetrators. The defense bases its conclusion on Stokes’ (alleged) description of one of the shooter’s as having “dark skin,” when neither defendant has dark skin, and the assumption that Allen’s statement to the police was similar to his son’s because “Stokes’ statements corroborated with the above.”
The evidence in this case does not support the defense assertion. The MORF authored by Detective Matthews says, “Allen did not see the shooter ... ”. If Allen did not see the shooter, he could not corroborate something he did not see, nor could he have agreed with his son’s “description” of the shooter as “dark skinned.” In fact, at trial Stokes consistently and unequivocally denied describing the shooters as dark skinned; he said the shooters had light skin. In fact, none of the witnesses at trial described the shooters as having dark skin. Stokes also testified that immediately prior to the shooting, his father identified the perpetrators as “Pookie and Herb.”
|slAs for Detective Matthews’ notation in the MORF that Stokes statement “corroborated” that of Allen, he testified that he meant that Stokes’ version of the shooting agreed with the general description of the sequence of events leading up to the shoot *628 ing provided by his father, not that Allen provided a description of one of the perpetrators with which his son agreed.[13]
Turning to the argument that the statement was crucial to the defendants’ case because it contradicted the testimony of Nekeia and Sanders, it appears that the defense intended to use the statement to impeach the Sanders’ testimony. However, La. C.E. art. 608, which deals with the use of statements for impeachment purposes, provides that a witness may be impeached only by his/her prior inconsistent statement, not through the testimony of another witness whose testimony may vary. Consequently, the statement provided by Allen supposedly exonerating the defendants may not be used to impeach Sanders’ and Nekeia’s identification of the defendants.
Nevertheless, even if the defense interpretation of the evidence that Allen’s statement exonerates the defendants was accurate, the statement lacks reliability and is uncorroborated. Allen identified the defendants moments before the shooting began, and there is no evidence identifying anyone but the defendants as the shooters. However, Allen’s statement, which follows, is fraught with inconsistencies:
Allen and his son, Karl Stokes (10 years old) and the victim Arthur Jackson were passengers in his vehicle. Allen drove to R.N. Auto Shop to meet with the owner[J Allen stated he |.^parked in front of the business and they exited the vehicle. They stopped in the street, next to his car to talk with ‘Kareem’, ‘Riley,’ and several other unknown black males ... Allen threw his son to the ground[.] Allen looked up and observed a dark colored unknown type vehicle speed off westbound on N. Galvez Street. Allen did not see the shooter or the driver.
The statement indicates that Allen was driving the van on the day of the shooting, but trial testimony contradicted that part of the statement, and, instead, placed the victim behind the wheel and Allen as a passenger. Further, trial testimony indicated that the victim, Allen, and Stokes remained in the van. But the statement indicates they exited the van and were standing next to it when the shooting began.
For the foregoing reasons, this assignment has no merit.

COUNSEL ASSIGNMENT OF ERROR NUMBER 3

Crump[14] argues that the trial court abused its discretion in denying the motion filed by Everett to sever their trials on the basis that he might implicate Everett at trial.
In his Motion to Sever, Everett theorized that because only “... [Crump], has been identified as committing this murder, [and] no witness has identified Mr. Everett as participating in the actual killing ... Mr. Everett’s defense will consist in pointing the finger at Mr. Crump and emphasizing the evidence against Crump and lack of evidence against himself (Everett).”
La.C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly *629 unless the state elects to try them separately, or the court, on motion of the | ^defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984). A defendant is not entitled to a severance as a matter of right; the decision to sever is one resting within the sound discretion of the trial court. Id. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Id.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. Id. The defendant bears the burden of proof in such a motion. Mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. Id. Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials. State v. Williams, 416 So.2d 914, 916 (La.1982).
In this case, the defendants’ defenses were not antagonistic — both defendants denied any involvement in the shooting, and neither blamed the other. The jury was instructed that although the defendants were being tried together, jurors were to consider the evidence against each defendant individually. Further, the trial judge instructed the jury on the law of principals.
Assuming the allegations of the Motion to Sever are true, only Crump, not Everett, was subjected to being faced by two accusers, the state and Everett. Additionally, assuming Crump’s defense might have incriminated Everett, it would have done so by establishing Everett as a co-participant. The evidence the state | ¡^produced at trial established that the defendants were principals, ie., both defendants fired shots in the victim’s direction and ultimately killed the victim. Defenses are not antagonistic where both defendants are principals and only the degree of participation of each defendant is at issue. The degree of blame each defendant seeks to cast upon the other does not suffice to warrant severance. State v. Bradford, 367 So.2d 745, 747 (La.1979). Consequently, severance of the defendants for trial was unnecessary. This assignment is meritless.

COUNSEL ASSIGNMENT OF ERROR NUMBER 4

This assignment of error argues that the trial court erred in refusing to grant a mistrial based on the prejudicial and improper comments made by the prosecutor in closing argument. Defendants object to the prosecutor commenting on the defense counsel’s job: alleging that the defendants were responsible for the death of a witness; referencing inadmissible hearsay; personalizing the crime to the jurors; and referring to the defendants as pit bulls.
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing *630 closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989). ^Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id.
La.C.Cr.P. Art. 774 limits the scope of argument to evidence admitted and conclusions of fact that the parties may draw therefrom. While the prosecution must base its conclusions and deductions in closing argument upon evidence adduced at trial, both state and defense are entitled to their own conclusions as to what is established by the evidence, and either may press upon the jury any view arising out of the evidence. State v. Mills, 505 So.2d 933, 951 (La.App. 2d Cir.1987). It is improper for the prosecutor to comment on his personal belief in the defendant’s guilt; but comment on the credibility of witnesses is proper and within the scope of closing argument. See La.C.Cr.P. art. 774; State v. Sayles, 395 So.2d 695 (La.1981).
Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, 99-0424, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where a prosecutor’s argument has exceeded the scope La. C.Cr.P. art. 774 or is deemed to be improper, a reviewing court should credit the good sense and fair-mindedness of the jurors who have heard the evidence. See State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703. As the Court noted in State v. Draughn, 05-1825, p. 44 (La.1/17/07), 950 So.2d 583, 614, “Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor’s comments lies in the sound discretion of the trial judge.” State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667.
IsfiThe comments during the state’s closing argument which the defendants argue are improper and prejudicial are:
And Karl Allen — excuse me, Karl Stokes, he remembers that day well. Because unfortunately that the last day he ever saw his dad. Because of what happened, because of what these two did.
[[Image here]]
The last thing I heard Gary Wainwright say before he sat down was he cared about this city. He wants to believe that he had some good noble cause that he’s fighting for. Gary Wainwright is fighting for Herbert Everett. Trust me. It is Mr. Wainwright’s job to walk Herbert Everett out of those doors.
[[Image here]]
Karl Allen ... obviously lied.
[[Image here]]
No murder weapon, but you’ve got the murder ammunition at Herbert Everett’s house, along with Pookie.
[[Image here]]
Pookie, who’s so cool, he likes to chunk up a deuce, while holding a pistol in a photo.
[[Image here]]
Ladies and gentlemen, remember in voir dire ... we talked about the sign and the dog in it and reward at the bottom? You said that people would be motivated. They may be motivated to help find that dog, to help bring some closure to the person who’s missing their dog, if you were going to get something in return. What if those dogs were two vicious Pit Bulls? Two vicious Pit Bulls *631 running down your block, that you just saw kill somebody?
[[Image here]]
In State v. Prestridge, 399 So.2d 564 (La.1981), the Court found that the prosecutor’s comment referring to matters allegedly within his personal knowledge but not in evidence improper. However, the Court refused to reverse the verdict since the comment did not appear to be of the type which would clearly influence the jury to the defendant’s prejudice. Id., 399 So.2d at 579.
|37In State v. Martin, 539 So.2d 1235 (La.1989), the Court concluded that references to “smoke screens,” while undesirable, do not rise to the level of prejudice necessary to constitute reversible error. The prosecution’s references to Japanese, Germans and “commi-pinkos,” though in very poor taste, were not an effort to inject race or national origin into the proceedings contrary to La.C.Cr.P. art. 770(1). Rather, it appeared from their context they were part of an inarticulate attempt to further the “smoke screen” image discussed previously in some sort of battle example. The remarks were not aimed at the defendant or his attorney, and therefore the trial court did not abuse its discretion in refusing a mistrial. Id., 539 So.2d at 1240.
State v. Hamilton, 356 So.2d 1360 (La.1978) and State v. Kaufman, 304 So.2d 300 (La.1974), stand for the rule that it is improper for the prosecutor to comment on his personal belief in the defendant’s guilt. Comment on the credibility of witnesses, however, is proper and within the scope of closing argument. See La.C.Cr.P. art. 774; State v. Sayles, 395 So.2d 695 (La.1981). Moreover, in State v. Simmons, 98-841 (La.App. 5 Cir. 6/1/99), 738 So.2d 1131, the prosecutor’s remark in closing characterizing the defendant as a killing dog was not reversible error, where evidence showed that defendant shot an unarmed man in the head at close range whom he had never met before, and prosecutor’s closing argument comments about defense counsel, while improper, were not so inflammatory or prejudicial as to warrant reversal of the defendant’s conviction, where the prosecutor expressed amazement at the moral rectitude, indignation and sanctimonious foolishness that defense lawyers could muster in trying to get their clients off.
|3SA1so of note in this case is the fact that the judge instructed the jury that the opening and closing arguments are not to be considered as evidence.
Even if the comments were improper, the defendants have failed to show that the prosecutor’s remarks contributed to the verdict.
Considering the statements made in the foregoing cases, we find that the comments complained of in this case are within the latitude afforded prosecutors in presenting closing argument. This assignment has no merit.

COUNSEL ASSIGNMENT OF ERROR NUMBER 5

By this assignment, Crump argues that the trial court erred in allowing evidence of other crimes and bad acts committed by him in violation of La. C.E. art. 404 B.[15] Further, Crump complains that *632 he was not given notice that evidence of other crimes and bad acts would be introduced by the state.
The evidence Crump complains of is:
(1) letters written by Crump to his grandmother;
(2) photographs of Crump holding a black automatic handgun;
(3) bullets seized during the search of Everett’s residence;
(4) Nekeia’s testimony that she was threatened about testifying;
I so(5) Detective Barnes’ statement that she knew Crump and he knew her;
(6) Detective Barnes’ claim that Davis did not appear out of fear of retaliation;
(7) contacts with the jury by state’s witnesses during breaks; and
(8) the state’s closing argument that defendants were also responsible for Stokes’ loss of his father.
In State v. Brown, 03-1616 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, this court reviewed the general law applicable to other crimes evidence as set forth by the Supreme Court in State v. Taylor, 01-1638, pp. 10-11 (La.1/14/03), 838 So.2d 729, 741-42:
Generally, courts may not admit evidence of other crimes to show defendant is a man of bad character who has acted in conformity with his bad character. However, under La. C.E. art. 404(B)(1) evidence of other crimes, wrongs or acts may be introduced when it relates to conduct, formerly referred to as res ges-tae, that “constitutes an integral part of the act or transaction that is the subject of the present proceeding.” Res gestae events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence “to insure that ‘the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’ ” State v. Colomb, 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting State v. Haarala, 398 So.2d 1093, 1098 (La.1981)). The res gestae doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. State v. Huizar, 414 So.2d 741, 748 (La.1982); State v. Kimble, 407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act (res gestae) evidence in Louisiana incorporates a rule of narrative completeness without which the state’s case would lose its “narrative momentum and Locohesiveness, ‘with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ” Colomb, 747 So.2d at 1076 (quoting Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
Brown, p. 11, 871 So.2d at 1247-1248.
If evidence is admissible under the res gestae exception, it is not subject to *633 notice requirements. State v. Walker, 99-2217, p. 6 (La.App. 4 Cir. 10/25/00), 775 So.2d 484, 489. A trial court’s ruling on the admissibility of evidence pursuant to La. C.E. art. 404 B(l) will not be disturbed absent an abuse of discretion. State v. Gibson, 99-2827, p. 12 (La.App. 4 Cir. 4/11/01), 785 So.2d 213, 220. The erroneous admission of other crimes evidence is subject to a harmless error analysis. State v. Maise, 00-1158, p. 17 (La.1/15/02), 805 So.2d 1141, 1153.
In this case, none of the items complained of is evidence of another crime or bad act committed by a defendant.
Although the defendant complains that some of the items are not relevant to prove the defendants’ guilt for the murder of the victim, the testimony was given by witnesses during the course of questioning related to the murder.
The correspondence referenced in item 1 — Crump’s letters to his grandmother — established Crump’s residence at the address where the search warrant was executed.
Items 2 and 3 — the photographs of Crump holding a gun and the ammunition found during the execution of search warrants — were used to show that Crump had access to weapons and ammunition of the type used in the shooting.
With regard to item 4, Nekeia testified that she had been threatened, but she did not identify who threatened her. There is no evidence that the threats came from the defendants. The prosecution elicited the information as an explanation of |41Nekeia’s motivation for testifying at trial — the pain the "victim’s mother suffered. The prosecution sought to negate the defendants’ argument that Nekeia had an ulterior motive in testifying at trial — to secure a reduction of her husband’s federal sentence.
Item 5 — Detective Barnes’ testimony that when Crump was apprehended, he said, “Ah, Ms. Barnes,” and she replied, “Ah, Pookie.” Detective Barnes’ testimony came in response to the defense questioning about the outcome of the execution of the search warrants.[16]
Item 6 was given in response to questioning by the defense and is Detective Barnes’ speculation that Davis might not have appeared at trial out of fear of retaliation.
Item 7 relates to the state’s witnesses’ contact with jurors during breaks; it is not evidence of a crime.
Item 8 references the state’s assertion that the defendants were also responsible for Stokes losing his father. When taken out of context, as 'the defendant does, it appears as if the prosecutor is blaming the defendants for Allen’s death. However, not only does the record indicate that the jury was aware that Allen died prior to trial in an accidental shooting unrelated to this case, the comment made by the prosecutor in closing argument did not relate to Allen’s death but to his son’s inability to see his father after the shooting. In that regard, the prosecutor said:
Karl Stokés, he remembers that day well. Because unfortunately that’s the last day he ever saw his dad. Because of what happened, because of what these two did — because of what these two did, Karl Stokes was rushed out of town the 142very next morning. And two weeks later his dad was dead. He [Stokes] never came back to New Orleans before *634 then. And “It’s Pookie and Herb” is one of the last things he ever heard his dad say.
Even if the complained-of evidence was improperly admitted, its admission was harmless error because of the overwhelming evidence presented at trial which established Crump’s identity as one of the men who murdered the victim. This assignment has no merit.

COUNSEL ASSIGNMENT OF ERROR NUMBER 6

In this assignment, the defendants argue that the trial court erred in denying the motion for new trial.
The defendants presented five arguments in favor of a new trial: (1) the evidence introduced at trial was insufficient to convict the defendants and the verdict was, therefore, contrary to the law and evidence; (2) “newly discovered evidence” in the form of two unidentified witnesses whose testimony would “clear Mr. Everett of any wrong doing in this matter;” (3) the state “knowingly” suborned perjury from eye-witness Sanders; (4) the court committed prejudicial error when it (a) refused to grant the defense motion to sever the defendants, (b) failed to grant the defendant’s motion to continue the trial because defense counsel was jailed prior to commencement of trial, and (c) failed to grant the defense’s motion for a mistrial when state witness, Nekeia, stated that she had been threatened not to testify; and (5) the interests of justice would be served by granting the defendant’s motion for a new trial because his “conviction is predicated solely on discovery violations and perjured testimony and the evidence against him was highly ^questionable and tenuous as best, as is evident by the 10-2 verdict rendered against him.”
The decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951 (La.1982). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. La.C.Cr.P. art. 851; State v. Johnson, 08-1488, p. 17 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 338, writ den., 10-0624 (La.10/8/10), 46 So.3d 1267.
As to the defense’s first argument in favor of a new trial, it alleges that the evidence introduced at trial was “insufficient to prove guilt beyond a reasonable doubt thus causing the jury’s verdict of guilty to be contrary to the law and the evidence.” The defense bases its argument upon the assertion that no physical evidence linked Everett to the crime, and the state’s eyewitness testimony given by Sanders was that of a convicted drug dealer.
This court has observed that “[w]hile there [is] no physical evidence to link defendant to the crime, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion.” State v. Marshall, 99-2176, p. 12 (La.App. 4 Cir. 8/30/00), 774 So.2d 244, 252. Therefore, even if there was no physical evidence to link Everett to the shooting, the allegation is irrelevant in the light of the foregoing law. Nevertheless, even in the absence of physical evidence linking the defendants to this crime, Sanders candidly admitted to the jury his status as a convicted felon. The jury also heard him explain that he and his wife were cooperating with the federal authorities in hopes of reducing his sentence in return for his testimony in this case. The jury heard the Sanders’ | ^testimony, *635 weighed it against their criminal records and their alleged motivation to lie about the events on the day of the shooting, and found them credible beyond a reasonable doubt.
Next, the defense argues it is entitled to a new trial based upon “newly discovered evidence” in the form of two witnesses whose testimony would “clear Mr. Everett of any wrong doing in this matter.”
La.C.Cr.P. art. 854 provides in part:
A motion for a new trial based on the ground [of newly discovered evidence] shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
(3) The facts which the witnesses or evidence will establish[.]
Initially, we note that the defendants’ motions do not meet procedural muster. There are no “allegations of fact, sworn to by the defendant or his counsel” or “names of the witnesses who will testify and a concise statement of the newly discovered evidence.” Nor have the defendants shown “that notwithstanding the exercise of reasonable diligence, the new evidence was not discovered before or during the trial.”
The defense complains that the “new witnesses”[17] were identified only by their nicknames during trial. However, there is no showing that the defense ] ^attempted to identify or contact those witnesses. Trial testimony indicates that the Sanders as well as other state’s witnesses gave the names of individuals present at the shooting when they spoke to the police.[18] The defense received a copy of those statements pre-trial, yet took no action. The defense contends that the “new witnesses” contacted the defendant’s family after the conviction, and they offered to testify that they “knew” the defendants did not shoot the victim.
We find it simply incredible to suggest that the “new witnesses” were unknown to the defense prior to trial. Nekeia named “Fatman” as witnessing the shooting. Furthermore, the witnesses knew the defendants and knew how to contact the defendants’ families yet did not come forward until after the trial.
Further, the defense assertion that the witnesses’ testimony would “contradict” that of the state’s witnesses is not a fact, but rather an opinion of that supposed testimony. Likewise, the defense’s unsupported assertion that the witnesses’ testimony would “clear the defendant of wrongdoing” is not a fact, but a legal conclusion for the trial court to determine.
Next, the defense argues that the state “knowingly” suborned perjury from eyewitness Sanders. According to the defense, Sanders perjured himself at trial *636 when he said he had not given the defendant’s name to the DEA. The defense maintains that a memorandum produced by the state contradicted Sanders’ testimony, but the trial court refused to admit the memorandum into evidence. The defense claims the trial court’s action denied it the right to impeach Sanders with the memorandum. In support of his argument, the defendant cites Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) for the proposition that where a prosecutor allows a Instate witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness’s testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. Id., 360 U.S. at 269, 79 S.Ct. 1173.
To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814. Furthermore, fundamental fairness, i.e., due process, is offended “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” Napue, 360 U.S. at 269, 79 S.Ct. 1173. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the granting of a new trial based upon a Na-pue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O’Keefe, 128 F.3d 885, 893 (5th Cir.1997).
Sanders did not perjure himself. He testified that he told federal agents “everything he knew” about this incident. He was not asked whether he told DEA agents defendant Crump’s name. Further, the defense has failed to produce a copy of the statement it contends proves that Sanders committed perjury. However, even if Sanders did tell DEA agents Crump’s name, the exclusion of the statement did not prejudice the defendant because the evidence was not exculpatory. We find no proof of state misconduct or that Crump suffered any prejudice in this instance. The statement was not material. The only “evidence” is the defendant’s | ^unsupported allegation that the state’s witness may have testified incorrectly about a collateral matter. The mere fact that Sanders testified differently on two occasions does not prove that he testified falsely. Such conflicting testimony indicates that he may have recalled details more clearly shortly after the shooting than he did at the time of trial, some two and one-half years later. Furthermore, it cannot be presumed that a prosecutor has knowledge that a witness’ answer is false simply because the witness may have testified somewhat differently on a prior occasion. The failure to disclose the pre-trial statement did not amount to suppression of evidence favorable to the defense, such that it would constitute a violation of due process. See Napue, supra.
The defense’s next complains the trial court committed prejudicial error when it: (a) refused to grant the defense motion to sever the defendants’ trials, (b) failed to grant the defendant’s motion to continue trial, and (c) failed to grant the defense’s motion for a mistrial when Nekeia stated that she had been threatened for coming forward to testify.
We have previously determined above in Counsel Assignments of Error Number 3 and 5 that the assertion is without merit. *637 Those arguments do not support the defense demand for a new trial.
Crump’s attorney argues he should have been granted a continuance because he was incarcerated for two days prior to the start of trial and suffered health problems, which caused him to elicit hearsay to his client’s detriment. However, counsel does not specify what his health problems were or how his condition detrimentally impacted his judgment. We have previously discussed this issue.
Finally, the defendant alleges that the denial of continuance resulted in an outcome for which the “interests of justice” require a new trial.
LaDefense counsel first appeared of record on 26 October 2007. Trial commenced on 14 September 2009, more than two years after defense counsel’s appearance of record. It is unrealistic to suggest that counsel’s two-day incarceration prior to trial of this case, which had been pending for more than two years, impaired counsel’s preparedness and performance so as to warrant a new trial.[19]
This assignment is without merit.

EVERETT PRO SE ASSIGNMENT OF ERROR NUMBER 3

In the last of his pro se assignments, Everett complains that the non-unanimous jury verdict in his case violated his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process.
Louisiana Constitution Article I, § 17(A) states that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782 A provides in part that “[c]ases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
In Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) the United States Supreme Court stated:
[T]he purpose of trial by jury is to prevent oppression by the Government by providing a ‘safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge.’ Duncan v. Louisiana, 391 U.S. 145 at 156, 88 S.Ct. 1444 at 1451, 20 L.Ed.2d 491 (1968) ... ‘Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the 14;iCommonsense judgment of a group of laymen ... ’ Williams v. Florida, supra, 399 U.S. 78 at 100, 90 S.Ct. 1893 at 1906, 26 L.Ed.2d 446 (1970). A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment. As we said in Williams, a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant’s guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where non-unanimous juries will convict or acquit. But in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served.
*638 In State v. Boudreaux, 08-1504, pp. 38-39 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1165, this court noted:
In State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in eases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Betrand, 08-2215, p. 8, 6 So.3d at 743.
IsnThis court cited and relied on Bertrand in State v. Barbour, 09-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court had erred in denying the defendant’s motion to declare La.C.Cr.P. art. 782 A unconstitutional as violative of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.
As stated by the Supreme Court in Bertrand, under current jurisprudence from the United States Supreme Court, non-unanimous twelve-person jury verdicts are constitutional; La.C.Cr.P. art. 782 A is constitutional.
Accordingly, this assignment has no merit.

CONCLUSION

For the foregoing reasons, we affirm the convictions of Herbert Everett and Tyrone Crump.
AFFIRMED.

. Detective Matthews described the vehicle as a mobile home.

. The victim died of his injuries the day after the shooting.

. Allen died shortly after this incident.

. Nekeia and Sanders married after this incident.

. The state distribution of marijuana charge was subsequently dismissed.

. Sanders also had two state convictions for possession of cocaine.

. Stokes testified that he could identify the defendants in court; however, the trial judge *620 refused to allow him to do so because he had not participated in a pretrial identification procedure.

. The lineups were introduced at trial without objection.

. The victim did not testify at trial.

. The employee did not testify at trial.

. The defendants failed to object to the introduction of Nekeia’s statement thereby waiving any objection to the identification statement. La.C.Cr.P. art. 841 A.

. Citing State v. Everett, 99-1963, pp. 8-9 (La.App. 4 Cir. 9/27/00), 770 So.2d 466, 471, reversed on other grounds, 00-2998 (La.5/14/02), 816 So.2d 1272.

. Detective Marshall explained at trial what he meant by corroborated::
"What I mean by 'basically said the same thing’ is that he was out there with his father and someone did start shooting and his father threw him to the ground. And that’s the part that corroborated with his father." [Emphasis supplied]

. Crump did not file a motion to sever or otherwise object to the joint trial and therefore waived any objection to the joint trial. "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence....” La.C.Cr.P. art. .841.

. La. C.E. art. 404 B(l) states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of ' motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable no *632 tice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

. Detective Barnes explained that she and "Pookie” recognized one another from previ-oús investigations.

. At the 10 September 2010, hearing on the motion for new trial, Derrick "Fatman" Franklin testified that he knew both of the defendants from school, and that they were not the shooters in this case. Further, Mr. Franklin testified that Nekeia could not have witnessed the incident because she was inside her office, and a yellow truck parked in front of the shop blocked her view of the shooting.
Moreover, immediately after the shooting, when witnesses began saying that "Pookie and Herb” were the gunman, Franklin disagreed and argued with them that the defendants were not the shooters.

. In fact, Nekeia Sanders named "Fatman” as one of those individuals.

. Defense counsel was present for jury selection which took place the day before trial.