Judge Terri F. Love
This application for supervisory review arises from defendant's application for post-conviction relief, which the trial court *116 denied. After review based on defendant's assertions of ineffective assistance of counsel, we find that defendant failed to meet to the burden outlined in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As such, the trial court did not err in denying his application for post-conviction relief. The writ is granted, but relief is denied.
PROCEDURAL HISTORY
Relator, Conell Galle, and his codefendant, Allen Scott (hereinafter "Defendants"), were jointly charged with two counts each of attempted second-degree murder and one count each of possession of a firearm by a convicted felon. The trial court denied Mr. Galle's motion in limine to have grand jury testimony of victim, Thomas Williams, who was allegedly unavailable as a trial witness, read into the record. This Court denied Mr. Galle's writ application seeking review of that decision.[1] Following a trial by a twelve-person jury, Defendants were found guilty as charged of the attempted second degree murder of Nykeisha Jackson (count one); not guilty as to attempted second degree murder of Mr. Williams (count two); and guilty as charged of possession of a firearm by a convicted felon.
Mr. Galle was sentenced on count one to forty years at hard labor and on count three to ten years at hard labor, both sentences to be served consecutively and without benefit of parole. On appeal, this Court affirmed Mr. Galle's convictions and sentences. The matter was remanded for imposition of the mandatory fine as to count three. Mr. Galle challenged the denial of his motion in limine to have the grand jury testimony of Mr. Williams read into the record. State v. Galle, et al. , 11-0930 (La. App. 4 Cir. 2/13/13), 107 So.3d 916, writ denied , 13-0752 (La. 10/30/13), 124 So.3d 1102.
Subsequently, Mr. Galle filed a counseled application for post-conviction relief asserting two claims: 1) the grand jury testimony of Mr. Williams should have been presented to the jury; and 2) that he was entitled to an evidentiary hearing. On the same day, Mr. Galle filed a pro se application for post-conviction relief asserting two claims: 1) ineffective assistance of counsel for failing to object to an erroneous jury instruction regarding attempted second degree murder and the corresponding responsive verdicts; and 2) he was denied his constitutional right to confront his accuser because the victim, Mr. Williams, did not testify.
The trial court issued a judgment denying Mr. Galle's application for post-conviction relief. Mr. Galle sought supervisory writs from this Court, which were denied. State v. Galle , 15-0584, unpub. (La. App. 4 Cir. 8/20/15). The Louisiana Supreme Court initially denied writs, but then granted reconsideration, vacating the trial court's ruling and remanding the matter to the trial court for an evidentiary hearing. State v. Galle , 15-1734 (La. 3/13/17), 212 So.3d 1164. The Supreme Court stated:
The district court's ruling denying post-conviction relief is vacated and the matter is remanded to the district court for an evidentiary hearing to determine whether exclusion of the grand jury testimony at trial, which the state disclosed before trial pursuant to Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), impeded relator's fundamental right to present a defense and whether trial counsel rendered ineffective *117 assistance with regard to litigating the admissibility of this evidence and demonstrating its importance to the defense. Notwithstanding that the Fourth Circuit on direct review found no error in the trial court's ruling excluding the grand jury testimony, see State v. Galle , 11-0930 (La. App. 4 Cir. 2/13/13), 107 So.3d 916, writ denied , 13-0752 (La. 10/30/13), 124 So.3d 1102, and the procedural bar against repetitive claims, the interest of justice requires revisiting these issues in a case in which relator's defense was that the state's sole eyewitness misidentified him and the state parted the usual cloak of secrecy which surrounds grand jury proceedings to disclose the testimony at issue because it directly contradicted that eyewitness account. See La.C.Cr.P. art. 930.4(A) ; see also State v. Galle, supra (Lombard, J., dissenting); see generally Stewart v. Wolfenbarger , 468 F.3d 338, 357 6th Cir. 2006), as amended on denial of reh'g and reh'g en banc (Feb. 15, 2007) (finding prejudice as a result of the exclusion from trial of exculpatory evidence that "went to the very heart of Petitioner's defense.").
Galle , 15-1734, pp. 1-2, 212 So.3d at 1165.
The trial court conducted an evidentiary hearing on Mr. Galles' application for post-conviction relief and denied his application. Mr. Galle's present application for supervisory review followed.
FACTUAL BACKGROUND
We previously summarized the facts surrounding Mr. Galle's alleged crimes in his previous appeal as follows:
The matter went to trial on March 14, 2011. During the three-day trial before a twelve-person jury, the following evidence was adduced. Among the State's witnesses were Ms. Jackson and the NOPD officers involved in the investigation. The State did not present Mr. Williams as a witness.
New Orleans Police Department Officer George Jackson was qualified by joint stipulation as an expert in the taking, examination, and comparison of fingerprints. Officer Jackson testified that he had taken defendant Scott's fingerprints in court the previous day. He matched those known fingerprints of defendant Scott to fingerprints on an arrest register, a bill of information, and a plea of guilty form evidencing what the officer said was Scott's 2006 conviction for illegal discharge of a firearm. Similarly, Officer Jackson testified that he had taken defendant Galle's fingerprints in court the previous day. He matched those known fingerprints to documents evidencing Galle's arrest and 2004 conviction for possession of cocaine.
The audio recordings of the 911 calls received in the early hours of March 21, 2009, two reporting gunshots and one reporting a person having been shot, were identified by Gesielle Roussel, the NOPD division supervisor and custodian of 911 audio recordings, and played for the jury. Ms. Roussel also identified the incident recall dated March 21, 2009, at approximately 4:23 a.m., from General Taylor and Loyola Streets, pertinent to the 911 calls and confirmed that at no point during any of the three calls was the alleged shooter identified.
Officer Vara testified as to his role in the events of March 21, 2009, stating that at approximately 4:20 a.m., he and his FTO were dispatched to the 2200 block of General Taylor Street as a result of 911 calls of gunshots. Upon turning onto General Taylor Street, Officer Vara saw the male later identified as Mr. Williams standing in the street covered in blood from a gunshot wound to the neck. In addition, as he approached *118 the residence at 2204 General Taylor Street, Officer Vara observed the female later determined to be Ms. Jackson lying on the ground with a gunshot wound to her head and another one to her chest area. Inside the residence, Officer Vara observed blood on all the walls except the middle bathroom. He identified photos of the scene, which were subsequently admitted into evidence. Officer Vara testified that the victims described the perpetrators to him only as two black males and, although he spoke to neighbors, none of them witnessed the shootings. Officer Vara related that he and his FTO brought Mr. Williams into the residence and sat him down on a couch inside to await medical assistance. A crack pipe and a push rod were found in the residence, but Officer Vara was unaware of any arrests being made in connection with those items. He did not recall any weapons or spent cartridge casings being found inside the residence.
On cross-examination, Officer Vara indicated that the shootings occurred in the middle bedroom, the room in which drug paraphernalia and money were found. He based this conclusion on a neighbor's report of hearing gunshots fired in the center of the residence. Although Officer Vara was absent from the scene when it was processed, he confirmed that photographs of the middle bedroom showed a crack pipe and push rod, a ten-dollar bill and a five-dollar bill, a box of Arm & Hammer Baking Soda, and an open box of plastic sandwich bags. Officer Vara did not recall seeing a plastic bag inside a toilet, as depicted in a crime scene photograph, but stated that it could have been there at the time he was in the residence. When asked how blood had been spread throughout the residence, Officer Vara refreshed his recollection by referring to his police report and then stated that when Thomas Williams was shot in the neck, he ran into the back of the residence and then ran back to the front.
NOPD Crime Scene Technician Bessie Patrolia testified that she processed the crime scene and identified a copy of her report. She stated that although she took eleven blood samples from the crime scene, none were submitted for a laboratory exam nor (to her knowledge) were any DNA profiles generated from the blood samples. She did not collect any latent fingerprints from the scene or from any object at the scene, specifically a twenty-dollar bill recovered; a crack pipe; or the metal push rod. To her knowledge, no ballistics report had been generated regarding the one spent bullet collected by her.
Bobby Dickerson testified that he was then in custody in Washington Parish with charges pending against him and had a 1991 conviction for possession of crack cocaine. He stated that he did not want to be in court that day, that he did not want to participate in the trial in any way, and that he did not want to answer any questions the prosecutor asked of him. After being declared a hostile witness on motion by the State, Dickerson denied knowing either defendant but referred to Mr. Williams as "Uncle." Dickerson recalled meeting with Detective McGhee, the crime scene investigator, on the day of the incident and confirmed talking with him about what happened when Mr. Williams got shot, but insisted "they" coerced him to say those things. Dickerson confirmed that he and Mr. Williams had gone to Ms. Jackson's residence to purchase drugs. He further confirmed that when they got to the residence, he stayed in the car while Mr. Williams went into the residence to meet with Jackson. When asked whether "Duke" (later identified as Galle) and *119 somebody else subsequently showed up at the residence, Dickerson said he did not know. When asked immediately thereafter whether, after Duke and the other person showed up, Duke and Ms. Jackson talked for a second, Dickerson replied that he did not know what they talked about inside.
When asked whether he saw Duke take out a gun and hand it to the other person, Dickerson said he did not see that happen. When asked whether he saw or heard Duke tell the other person to "lay that bitch down," Dickerson replied that he had not seen that, but had been coerced "to say all that what I just said in my first statement." When asked whether he had told Detective McGhee those things, Dickerson confirmed that he had, stating, "[h]e coerced me to say that." Dickerson said he was on narcotics at the time. Dickerson denied seeing Jackson get shot in her head. He denied seeing the person who was with Duke shoot Mr. Williams in the neck. Dickerson stated that he left after the shooting but returned to the scene to check on Mr. Williams. After Mr. Williams and Ms. Jackson were taken to the hospital, Dickerson met with Detective McGhee and told him "all of these things." He reiterated that he was coerced by the detective into saying what he did in his statement.
On cross-examination, Dickerson stated that he was parked across the street from Jackson's residence. He said the screen door on the residence was closed, and the porch light was off. It was around 4:00 a.m. or 5:00 a.m., and dark. Dickerson conceded he had been using drugs all night, "smoking and using heroin," and confirmed that the whole night was a blur to him. He replied in the affirmative when asked whether the recorded statement Detective McGhee said Dickerson made to him had been coerced and influenced by the detective. According to Dickerson, the detective talked to him before the recorded statement was made so he would know what to say on the recorded statement.
On redirect examination, Dickerson stated that he heard shots that morning, but did not know from where they came. He confirmed that he saw Williams with a gunshot wound to his neck.
NOPD Detective Nathan McGhee testified that when he responded to the shooting at 2204 General Taylor Street on March 21, 2009, he met with the two initial responding officers, one of whom was Officer Vara. When he entered the residence he observed the first victim, Ms. Jackson, lying on the floor of the living room with a gunshot wound to her head, one to her abdomen, and one to her leg. She appeared to be very near death. He also observed Mr. Williams sitting on a sofa holding a towel to a gunshot wound to his neck, which was bleeding profusely. Detective McGhee developed a suspect, "Duke," whom he later determined was defendant Galle. Detective McGhee testified that Mr. Williams was reluctant to say anything and provided no relevant information; he said Mr. Williams was just screaming for medical attention. Detective McGhee spoke to a witness named Freddie Davis, who told the detective he had been in the back of the residence when the shootings occurred. Davis did not witness the shootings; he only heard and saw one of the victims running to the rear of the residence.
Detective McGhee also spoke to Bobby Dickerson, who told him that he had observed a subject he knew as "Duke." Detective McGhee said Dickerson was cooperative and that Dickerson knew both victims. Dickerson said that he had dealings with Ms. Jackson in the past.
*120 Dickerson worked with Mr. Williams and had come to the General Taylor Street residence in Mr. Williams' vehicle. After Detective McGhee developed defendant Galle as a suspect, he included his photo in a six-photo lineup and displayed it to Bobby Dickerson on March 24, 2009. Detective McGhee said this was the second time he had contact with Dickerson, the first time being the morning of the shootings. Detective McGhee said Dickerson came to him, presumably to a police station, to make the identification. After Dickerson identified Galle, Detective McGhee prepared an arrest warrant for Galle. When asked whether he told Dickerson who to pick out of the photo lineup, Detective McGhee said he had not, noting that Dickerson knew the subject and had had dealings with him in the past.
Detective McGhee testified that he met with Ms. Jackson on April 13, 2009, and showed her a photo lineup in which she identified defendant Galle who was known to her as "Duke." Detective McGhee stated that he did not force, threaten or coerce Ms. Jackson into identifying Galle or promise or give her anything in exchange for identifying him as the individual who handed the gun off to the shooter. Detective McGhee testified that he also learned on that date that Ms. Jackson could identify the individual who had fired the shots during the incident, although she did not know his name. She claimed to have been to that individual's residence in the company of defendant Galle. Detective McGhee testified that when Ms. Jackson was well enough, he picked her up with the assistance of the District Attorney's Office and brought her to a location where she pointed out an apartment in the Willowbrook Apartments where the shooter had been present. He later confirmed on cross-examination that this had occurred on July 29, 2009. At the apartment complex, Ms. Jackson described for the detective a female who lived in the apartment. Detective McGhee subsequently set up surveillance with another detective and observed the described female. He subsequently discovered that a male living in the apartment was defendant Scott. On August 3, 2009, Detective McGhee displayed a photo lineup to Ms. Jackson containing a photo of defendant Scott and she identified him as the shooter without Detective McGhee forcing, threatening, or coercing her, or promising or giving her anything in exchange. Detective McGhee identified the respective photo lineups shown to Ms. Jackson in which she identified defendants Galle and Scott. Detective McGhee testified that Ms. Jackson identified Scott as the shooter, the person to whom Conell "Duke" Galle had handed the gun. Detective McGhee identified Galle and Scott in court.
On cross-examination, Detective McGhee testified that when he displayed the photo lineup containing defendant Galle's photo to Ms. Jackson, he asked her if she recognized the person she knew as "Duke" in the lineup. The detective made no request for the testing of any blood samples because he had no information that either of the perpetrators had been injured. No testing was done on the bullet because, Detective McGhee said, police had no gun to link to the bullet. The detective confirmed that he met with Bobby Dickerson on three occasions: the day of the incident; the day following the incident; and on the date he displayed the photo identification to him. Detective McGhee said that Dickerson told him he and Mr. Williams stopped to purchase drugs on their way to work.
*121 Under further cross-examination, Detective McGhee confirmed that Dickerson gave a description of one suspect as being 6'4?, weighing 180 pounds, while police reports in the case reflected that defendant Scott was 5'9?. Detective McGhee confirmed that there was no evidence connecting defendant Scott to the crime or to the crime scene except for the word of Ms. Jackson.
Warren Spears, the supervisor over property and evidence for the Office of the Clerk of Criminal District Court, testified that his job entailed maintaining evidence brought to the clerk's office by law enforcement, primarily the NOPD. He detailed the procedure.
Ms. Jackson identified a previously-admitted photograph of the General Taylor Street residence in which she resided on March 21, 2009. She stated that in the early morning hours of March 21, 2009, she was drinking and indulging in drugs, having begun doing so the night before, around 9:00 p.m. A friend, Freddie Davis, who lived out of town, came over around 10:30 or 11:00 p.m. to spend the night in a spare bedroom. Davis brought a six-pack of beer with him, but he did not consume any drugs with Jackson. Someone from the neighborhood she knew as "Thomas" knocked on her front door around midnight or 1:00 a.m. Ms. Jackson opened her iron security door, let Mr. (Thomas) Williams inside, and told him to lock the door. Ms. Jackson testified that she had already consumed drugs (she later stated that she had smoked crack cocaine earlier that day) and was no longer high, but was still drinking and was intoxicated.
Ms. Jackson said Mr. Williams related to her that he had seen Galle at a gas station earlier that day and that Galle had told him to come to her residence. Ms. Jackson knew Galle by the name "Duke" and she identified him in court. Ms. Jackson stated that she had known Galle for seven or eight months and that they had an on and off sexual relationship, but did not have a boyfriend/girlfriend relationship. She said Mr. Williams was seeking to purchase drugs from Galle. She telephoned Galle, who, upon being informed by Ms. Jackson that Mr. Williams was at her residence to purchase drugs, said: "Bitch, I already know that. Open up the door." When Ms. Jackson opened her interior door and exterior security door, she saw defendants Galle and Scott. She stated that although she did not know defendant Scott's name, he usually was with defendant Galle when she saw him and, in addition, she had spoken with Scott and been invited several times to "their" residence in Willowbrook Apartments in eastern New Orleans where she met Scott's girlfriend.
According to Ms. Jackson, after defendants Galle and Scott entered her residence in the early morning hours of March 21, 2009, she was standing in the front room with the defendants and Mr. Williams. Freddie Davis was still in the back bedroom. Ms. Jackson said she noticed that defendant Galle had rage in his eyes, questioning why Mr. Williams was in the house. She said Galle had a large firearm with a big drum (apparently meaning a large-capacity drum magazine) inserted into the firearm. Galle said to Mr. Williams: "Man, what the fuck you doing up in here?" Ms. Jackson said at that point to Galle: "What is he doing in here?" Ms. Jackson then said to Mr. Williams: "Didn't you tell me that he said for you to come here?" Mr. Williams replied in the affirmative, trying to explain himself to defendant Galle. Ms. Jackson said that at that point she was furious, and stated:
*122 "Man, guess what? All y'all get the fuck up out my house."
Ms. Jackson testified that defendant Galle then removed a handgun from his waist, passed it to Scott, and told Scott, "Lay the bitch down." The next thing she knew, she was on the floor. She stated that she must have been out for a few seconds because she did not know what had happened. Unbeknownst to her at the time, she had been shot in the head. Her vision was blurred momentarily. When she regained it, Ms. Jackson observed Mr. Williams with blood spurting out of both sides of his neck. She said she did not remember being shot in the head or remember Mr. Williams being shot. She exclaimed: "Man, y'all done shot this nigger in my house." At that point, defendant Galle said to defendant Scott: "The bitch ain't dead. Man, this bitch ain't dead. Shoot her again." Ms. Jackson testified that defendant Scott then shot her in her chest, stomach, and one of her knees. She said she was still on the ground when that happened. Ms. Jackson said defendant Galle said to her: "See what you made me do, you bitch? You know I loved you." Galle and Scott then left the residence.
Ms. Jackson detailed the serious extent of her injuries resulting from the gunshots. She identified the clothing she wore on the morning she was shot, including a new wig she had purchased with money given to her by defendant Galle, along with a new stocking cap she had been wearing underneath the wig. She manipulated it to show a hole which she assumed must have been a bullet hole because the stocking had been brand new. She was shot four times. Ms. Jackson said she had probably been to doctors thirty or forty times for treatment related to her injuries and had been in and out of the hospital. She went to a neurologist for her head and another physician for treatment of her stomach and gastrointestinal problems. She was shot in the chest and stomach, and still had a bullet lodged in her abdomen, resulting in gastrointestinal problems, including bowel obstructions. She testified that half of her intestines had been removed and her liver repaired, and that she had staples from the top of her breastbone to her navel. She still had bullet fragments in her left knee. She had to learn how to walk all over again, and used a walker for two months.
Ms. Jackson identified a crack pipe that had been in her pants pocket that night, and an accompanying metal push rod. She remembered Detective McGhee being on the scene and checking on her. She implored him not to let her die. Ms. Jackson replied in the affirmative when asked whether she believed she was going to die. When asked whether she remembered talking to anyone else that night, she said she just remembered asking and pleading for Detective McGhee not to leave her and not to let her die. Once she got out of the hospital, towards the end of March or beginning of April, 2009, she met with Detective McGhee at her residence. She told him about defendant Galle, but did not know defendant Scott's name at the time. She identified defendant Galle, or "Duke," in a photo lineup presented to her by Detective McGhee. She said defendant Galle was the person who told defendant Scott to shoot her. She later met with Detective McGhee in July, when he presented her with a photo lineup in which she selected a photograph of defendant Scott as the person who shot her.
Ms. Jackson testified on cross-examination that she might have smoked four rocks of crack cocaine between 9:00 p.m. and 11:00 p.m. in the hours before the shootings, which occurred early the next *123 morning. She confirmed that she had been drinking since approximately 3:00 p.m. or 4:00 p.m., having drunk two or three beers during an afternoon second-line parade and three beers from the six-pack that Freddie Davis had brought when he came over that night.
After deliberations, the jury found both defendants guilty as charged of the attempted second degree murder of Ms. Jackson, but not guilty as to the attempted second degree murder of Mr. Williams. In addition, both defendants were found guilty of being convicted felons in possession of a firearm.
Galle , 11-0930, pp. 2-13, 107 So.3d at 920-25.
INEFFECTIVE ASSISTANCE OF COUNSEL
Mr. Galle contends that the trial court erred in denying his application for post-conviction relief by (1) ruling that the exclusion of Mr. Williams' grand jury testimony did not impede Mr. Galle's fundamental right to present a defense; (2) ruling that Mr. Williams was not "unavailable" as a witness under La. C.E. article 804(A) ; and (3) finding that trial counsel was not ineffective for failing to raise Mr. Williams' unavailability at the time of trial.
The trial court found that Mr. Galle's claim of ineffective assistance of counsel was without merit, i.e., that Mr. Galle did not suffer any prejudice from any alleged failure of trial counsel to raise and/or prove Mr. Williams was an "unavailable" witness at the time of trial. The trial court further determined that there was no error in its refusal to admit Mr. Williams' grand jury testimony into evidence at trial.
This Court set forth the applicable jurisprudence on ineffective assistance of counsel in State v. Rubens, 10-1114, pp. 58-59 (La. App. 4 Cir. 11/30/11), 83 So.3d 30, 66-67, as follows:
Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La. 10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064 ; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068 ; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
Accordingly, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064. A convicted defendant's claim that his counsel's ineffective assistance entitles him to a *124 new trial has two component parts. Id. at 687. "First, the defendant must show that counsel's performance was deficient." Id. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second, the defendant must show that the deficient performance prejudiced the defense." Id. "Unless a defendant can make both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id. Consequently, and importantly for our purposes here, we need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.
"[I]f an alleged error falls 'within the ambit of trial strategy' it does not 'establish ineffective assistance of counsel.' " State v. Bordes, 98-0086, p. 8 (La. App. 4 Cir. 6/16/99), 738 So.2d 143, 147, quoting State v. Bienemy , 483 So.2d 1105, 1107 (La. App. 4th Cir. 1986). " '[O]nce a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney.' " State v. Small , 13-1334, pp. 14-15 (La. App. 4 Cir. 8/27/14), 147 So.3d 1274, 1284 (quoting State v. Bradford , 02-1452, p. 24 (La. App. 4 Cir. 4/23/03), 846 So.2d 880, 895 ). The appellate court cannot "second-guess strategic and tactical choices made by trial counsel." State v. Myles, 389 So.2d 12, 31 (La. 1979).
We find that Mr. Galle did not receive ineffective assistance of counsel regarding the admissibility of Mr. Williams' grand jury testimony. Trial counsel's decision not to pursue the matter after the trial court denied the motion in limine and this Court denied supervisory writs, constituted trial strategy, which cannot be second-guessed after trial. Counsel stated at the hearing on the application for post-conviction relief that he did not pursue the issue further because the trial judge indicated that she was not going to allow the grand jury testimony into evidence. Trial counsel was also aware that there was an adequate remedy on appeal. This Court considered the issue on appeal and found that Mr. Williams' testimony was properly excluded.
Moreover, the evidence did not support a finding that Mr. Williams was unavailable as a witness. La. C.E. article 804(A) defines when a witness or "declarant" is unavailable:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement;
(2) Persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so;
(3) Testifies to a lack of memory of the subject matter of his statement;
(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness, infirmity, or other sufficient cause; or
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to *125 the procurement or wrong-doing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
Once the trial court has declared a witness unavailable, a party may offer "[t]estimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." La. C.E. art. 804(B)(1). The determination of whether a witness is unavailable "is a preliminary question for the trial court." State v. Ball, 00-2277, p. 26 (La. 1/25/02), 824 So.2d 1089, 1112. See also La. C.E. art. 104(A). A trial court's finding as to whether a witness is unavailable is "reviewed for manifest error and will not be overturned, absent an abuse of the trial court's discretion. Id. A witness is not "unavailable" unless "a diligent and good faith effort to obtain his presence at trial" has been made. State v. Armstead , 14-0036, p. 21 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 517.
Testimony presented at the hearing on the application for post-conviction relief revealed that Mr. Williams was known to Mr. Galle and trial counsel prior to trial. Trial counsel was Mr. Galle's attorney prior to his arrest and was present when Mr. Galle turned himself in to the police. About a week after Mr. Galle's arrest, Mr. Williams met with trial counsel and executed an affidavit in which he swore that Mr. Galle, while present at the scene, had no involvement in the shooting. Trial counsel presented the affidavit to the District Attorney's office and facilitated Mr. Williams' presence and testimony before the grand jury. Trial counsel stated that he was made aware of Mr. Williams by Mr. Galle and obtained Mr. Williams' contact information through Mr. Galle's family. Trial counsel stated that he could not locate Mr. Williams prior to trial. However, trial counsel admitted that he did not seek to subpoena Mr. Williams and did not provide evidence of how he attempted to locate Mr. Williams. There was no evidence that trial counsel or Mr. Galle attempted to reach out to Mr. Williams through Mr. Galle's family. In light of the lack of evidence concerning the attempt to locate Mr. Williams prior to trial, the trial court did not err when it found that Mr. Galle had not proved Mr. Williams was unavailable.
The finding that Mr. Williams was not an "unavailable" witness and the exclusion of Mr. Williams' grand jury testimony did not impede Mr. Galle's fundamental right to present a defense. Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. This standard of fairness requires "that criminal defendants be afforded a meaningful opportunity to present a complete defense." California v. Trombetta , 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Additionally, the Sixth Amendment grants a criminal defendant the right to present a defense. U.S. Const. amend. 6 ; La. Const. Art. 1 § 16 ; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ; State v. Gremillion, 542 So.2d 1074 (La. 1989) ; State v. Vigee, 518 So.2d 501 (La. 1988).
The fundamental right to present a defense may not be superseded by evidentiary rules. Gremillion , 542 So.2d at 1078. The defendant in Gremillion attempted to introduce evidence that third parties, rather than the defendant, had killed the victim. Id. at 1076. The evidence consisted of a statement that the victim had made to a sheriff's deputy who investigated the crime. Id. at 1077. The statement was that he had been attacked and *126 beaten by three white males. Id. at 1076. The trial court and the appellate court both held the statement was inadmissible hearsay. Id. The Court agreed that the statement was hearsay and that it did not meet any applicable exception to the hearsay rule. Id. at 1077. However, the Court held that normally inadmissible hearsay may be admitted if it is reliable, trustworthy and relevant, and if to exclude it would compromise the defendant's right to present a defense. Id. at 1078. The Court found that exclusion of the statement "impermissibly impaired" the defendant's fundamental right to present a defense. Id. at 1079. The Court described the nature of the statement as follows:
While the statement does not fit into any of the recognized exceptions to the hearsay rule, it should have, nevertheless, been admitted into evidence due to its reliability and trustworthy nature. The statement to Deputy Bowden, while not identical to the one given to the admitting physician who took Dupuy's history, was corroborated by that statement, in which Dupuy stated that he was attacked by "several others." The defendant and Dupuy were close friends, yet in two separate statements Dupuy failed to identify the defendant as his attacker. The statement indicating that Dupuy was attacked by "three white males" was given to a police officer investigating the crime, and there is no circumstance to suggest that the statement was untrustworthy. The state suggests that Dupuy may have been motivated by his friendship with the defendant when he failed to identify him as his attacker. There is no particular support for it in the record. Dupuy left the bar around 2:00 a.m., and there is no indication of his whereabouts from that time until 10:00 a.m. the next day, when he checked into the hospital. The possibility exists that Dupuy was attacked during this time, and the credibility of this defense should have been presented to the jury to assess.
While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted.
Gremillion , 542 So.2d at 1078.
Similarly, this Court, in State v. Everett , 11-0714, p. 23 (La. App. 4 Cir. 6/13/12), 96 So.3d 605, 624, considered a case wherein the defendants contended on appeal that they were misidentified as the perpetrators and their right to present a defense of misidentification was hampered by the exclusion of a statement made to a police officer. The defendants asserted that the statement cast doubt on the identifications made by other witnesses. Id. The statement at issue was made by a witness, Karl Allen, who drove the victim, Arthur Jackson, to the hospital. 11-0714, p. 24, 96 So.3d at 624. The witness told the police officer that his son, Karl Stokes, and the victim
were passengers in his vehicle. Allen drove to R.N. Auto Shop to meet with the owner, only know as "Riley", to inquire about having his car repaired. Allen stated he parked in front of the business and they exited the vehicle. They stopped in the street, next to his car to talk with 'Kareem', 'Riley' and several other unknown black males. Allen said about four to five minutes later he heard six or seven gunshots, Allen threw his son to the ground and heard Jackson yell he was shot. Allen looked up and observed a dark colored unknown type vehicle speed off westbound on N. Galvez Street. Allen did not see the shooter or the driver.
Everett , 11-0714, p. 24, 96 So.3d at 624. The police officer noted that Karl Stokes' statement corroborated Allen's statement *127 and that "Stokes added he saw an unknown dark skin black male, wearing a dark shirt shooting from across the street." Id. The defendants averred that even though the statement may have been hearsay, it should have been admitted into evidence because it exonerated them and contradicted the testimony of two other witnesses. Id. , 11-0714, p. 29, 96 So.3d at 627.
This Court recognized that the Louisiana Supreme Court held that "under compelling circumstances a defendant's right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule." Id. , 11-0714, p. 29, 96 So.3d at 627. "Normally inadmissible hearsay may be admitted if it is reliable, trustworthy, and relevant, and if to exclude it would compromise the defendant's right to present a defense." Id. , 11-0714, p. 30, 96 So.3d at 627. "This right to present a defense, however, does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice." Id.
The Everett Court found the statement in question was not admissible because it was not reliable or trustworthy. Id. , 11-0714, pp. 31-32, 96 So.3d at 628. The Court stated:
In this case, the defense contends that reading Allen's statement in conjunction with his son's statement to the police proves that the defendants were not the perpetrators. The defense bases its conclusion on Stokes' (alleged) description of one of the shooter's [sic] as having "dark skin," when neither defendant has dark skin, and the assumption that Allen's statement to the police was similar to his son's because "Stokes' statements corroborated with the above."
The evidence in this case does not support the defense assertion. The MORF authored by Detective Matthews says, "Allen did not see the shooter ...". If Allen did not see the shooter, he could not corroborate something he did not see, nor could he have agreed with his son's "description" of the shooter as "dark skinned." In fact, at trial Stokes consistently and unequivocally denied describing the shooters as dark skinned; he said the shooters had light skin. In fact, none of the witnesses at trial described the shooters as having dark skin. Stokes also testified that immediately prior to the shooting, his father identified the perpetrators as "Pookie and Herb."
* * *
Turning to the argument that the statement was crucial to the defendants' case because it contradicted the testimony of Nekeia and Sanders, it appears that the defense intended to use the statement to impeach the Sanders' testimony. However, La. C.E. art. 608, which deals with the use of statements for impeachment purposes, provides that a witness may be impeached only by his/her prior inconsistent statement, not through the testimony of another witness whose testimony may vary. Consequently, the statement provided by Allen supposedly exonerating the defendants may not be used to impeach Sanders' and Nekeia's identification of the defendants.
Nevertheless, even if the defense interpretation of the evidence that Allen's statement exonerates the defendants was accurate, the statement lacks reliability and is uncorroborated. Allen identified the defendants moments before the shooting began, and there is no evidence identifying anyone but the defendants as the shooters. However, Allen's *128 statement, which follows, is fraught with inconsistencies:
Allen and his son, Karl Stokes (10 years old) and the victim Arthur Jackson were passengers in his vehicle. Allen drove to R.N. Auto Shop to meet with the owner[.] Allen stated he parked in front of the business and they exited the vehicle. They stopped in the street, next to his car to talk with 'Kareem', 'Riley,' and several other unknown black males ... Allen threw his son to the ground[.] Allen looked up and observed a dark colored unknown type vehicle speed off westbound on N. Galvez Street. Allen did not see the shooter or the driver.
The statement indicates that Allen was driving the van on the day of the shooting, but trial testimony contradicted that part of the statement, and, instead, placed the victim behind the wheel and Allen as a passenger. Further, trial testimony indicated that the victim, Allen, and Stokes remained in the van. But the statement indicates they exited the van and were standing next to it when the shooting began.
Everett , 11-0714, pp. 30-32, 96 So.3d at 627-628.
We find that the facts of the present case are analogous to Everett . A review of Mr. Williams' testimony at the hearing on the application for post-conviction relief reveals that his testimony was sought to contradict Ms. Jackson's testimony and attack her credibility. Mr. Williams stated that Mr. Galle had no involvement with the shooting, and was on the porch with him when the shooting took place. Mr. Williams stated that the perpetrator ran past both he and Mr. Galle on the porch, went into the house, and shot Ms. Jackson. The perpetrator then came back out, shot Mr. Williams in the neck, and ran off. Mr. Williams allegedly ran through the house towards the back, and then ran to the front of house, exited the house and was in the street, when the police arrived. Mr. Williams acknowledged that the perpetrator arrived with Mr. Galle. Therefore, Mr. Williams' testimony placed Mr. Galle on the scene at the time of the shooting and indicated Mr. Galle had some type of connection with his co-defendant.
On cross-examination, Mr. Williams admitted he had several prior convictions, which could have been used at trial to attack his credibility. Testimony relating to Mr. Williams' relationship with Mr. Galle was also introduced - Mr. Galle was Mr. Williams' drug dealer. Mr. Williams went to the house to purchase drugs from Mr. Galle. This testimony would have been corroborated by Ms. Jackson and the original statement of Mr. Williams' friend, Bobby Dickerson, who accompanied Mr. Williams to Ms. Jackson's house. Mr. Dickerson also informed police that Mr. Galle and his co-defendant, Mr. Scott arrived at the house together.
Mr. Galle knew, prior to trial, the content of Mr. Williams' testimony. Mr. Williams provided defense counsel with an affidavit exonerating Mr. Galle. Mr. Williams provided the same testimony to the grand jury. Mr. Galle also knew that if Mr. Williams testified, his credibility would have been attacked, and there was the potential and probability that Mr. Williams' testimony would not have been accepted by the jury. In fact, Mr. Williams' testimony placed Mr. Galle at the crime scene at the time of the offense. Counsel's failure to ensure presentation of Mr. Williams' testimony, which was contradicted by Ms. Jackson and Mr. Dickerson's statement to police and had internal contradictions, was not prejudicial to Mr. Galle. Mr. Williams' testimony was not accepted and/or believed by the grand jury, *129 which indicted Mr. Galle for the attempted second degree murders of Mr. Williams and Ms. Jackson. Counsel's alleged error in failing to effectively litigate the underlying issue to the trial and appellate courts, which both considered and rejected the claim that the grand jury testimony should have been introduced, did not render the trial unfair or the verdict suspect. As such, we find that the trial court did not err by denying Mr. Galle's application for post-conviction relief, and deny relief.
DECREE
For the above-mentioned reasons, we find that Mr. Galle did not demonstrate that he was prejudiced by alleged deficiencies committed by his former counsel. Therefore, he failed to meet his burden for relief pursuant to Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The application for supervisory review of the trial court's denial of the application for post-conviction relief is granted, but relief is denied.
WRIT GRANTED; RELIEF DENIED

State v. Galle , unpub., 11-0265 (La. App. 4 Cir. 2/25/11), writ denied , 11-0441 (La. 3/11/11), 60 So.3d 1237.